Anna **BLAKE**, et al., Plaintiffs,

v.

**BELL'S TRUCKING, INC.,**
**et al., Defendants.**

**No. CIV. JFM 99–11.**

United States District Court,
D. Maryland.

April 6, 2001.

Barry S. Brown, Baltimore, MD, for plaintiff.

Robert G. McGinley, Macleay Lynch Gregg and Lynch, Washington DC, for defendant.

### *MEMORANDUM*

MOTZ, Chief Judge.

This action, brought by Anna Blake and her husband Lawrence Blake ("plaintiffs") against Bell's Trucking, Inc. and Bell's Bus Services, Inc. ("defendants"), arises out of a slip and fall accident. Plaintiffs have brought suit for negligence, breach of contract, and loss of consortium. Defendants have filed a motion in limine to exclude the testimony of plaintiff's expert and a motion for summary judgment. The motion in limine will be granted.[1] The motion for summary judgment will be granted.

### I.

Plaintiffs were part of a choral group that traveled on defendants' bus from Dundalk, Maryland to the Pines Resort Hotel ("the hotel") in South Fallsburg, New York on January 5, 1996. The hotel is a ski resort in the Catskill Mountains.[2] It began to snow several hours before the bus reached the hotel. The bus pulled into a covered driveway area under the hotel. The driveway cuts through the ground floor of the hotel. The covered driveway, which is maintained by Pines Resort, is open on two ends, but it is protected by the hotel on the other two sides and above. (*See* Def. Ex.# 5.) Bart Rasnick, director of hotel security, testified that the area under the covered driveway was where bus drivers, at the direction of hotel personnel, usually stopped to unload passengers during the winter. (*See* Rasnick Dep. at 26–

27.) Outside of the covered driveway, the ground, including the road, was covered in snow. (*See, e.g.,* Mrs. Blake Dep. at 30.) Under the covered driveway, there was some snow and ice, but it was more clear than outside of the covered driveway. (*See id.*)

The bus stopped several feet from the curb on the driver's right-hand side. On that side, the bus door faced the hotel fitness center. The record reflects that several cars were parked or temporarily stopped in between where the bus stopped and the curb in front of the fitness center. On the other side of the covered driveway was the a door marked "Hotel Registration."

Several passengers heard the bus driver say "be careful," as they began to disembark. Several other passengers, including Mrs. Blake, testified that they did not hear this warning. Mrs. Blake was approximately the fifth passenger off the bus. She took several steps, slipped, and fell. She broke her hip, which necessitated three operations and cost $90,000 in medical bills.

### II.

Under New York law, a common carrier owes a duty to an alighting passenger to stop at a place where the passenger may safely disembark and leave the area. *See, e.g., Miller v. Fernan,* 73 N.Y.2d 844, 537 N.Y.S.2d 123, 534 N.E.2d 40, 41 (1988); *Blye v. Manhattan & Bronx Surface Transit Operating Auth.,* 511 N.Y.S.2d 612, 614, 124 A.D.2d 106, 109 (N.Y.App. Div.1987) *aff'd by* 72 N.Y.2d 888, 532 N.Y.S.2d 752, 528 N.E.2d 1225 (1988). Once a safe alighting point is provided, the

---

1. I need not reach all of the issues presented in the motion in limine.

2. The hotel is not a party to this suit.

operator's duty is completed.[3] *Blye*, 124 A.D.2d at 109, 511 N.Y.S.2d 612. "Only when the placement of the bus dictates that the passenger navigate a treacherous path should the public carrier be held liable for any injuries proximately caused by that hazardous condition." *Connolly v. Rogers*, 195 A.D.2d 649, 599 N.Y.S.2d 731, 732–33 (N.Y.App.Div.1993).

■ Common carriers do not have an absolute duty to prevent any injury to alighting passengers. *See, e.g., Blye*, 124 A.D.2d at 114, 511 N.Y.S.2d 612. New York law does not require that the area where passengers disembark "be in such a condition as to render it impossible for a passenger to slip or become injured." *Id.*

■ In analyzing a common carrier's duty during snowy and icy conditions, courts consider whether the bus stopped at the most clear area. For example, in *Hickey v. Manhattan & Bronx Surface Transit Operating Auth.*, at the time that the plaintiff disembarked, a small amount of snow had recently fallen. 163 A.D.2d 262, 558 N.Y.S.2d 543, 545 (N.Y.App.Div. 1990). The bus driver stopped at an area where several inches of snow and ice from an earlier storm had not been cleared. *Id.* Another area at the same bus stop had been cleared of the earlier snow. *Id.* The court upheld a jury verdict for the plaintiff because, "the jury could have concluded that [the bus driver] was negligent in discharging plaintiff at a location where she was forced to tread a dangerous path, *rather than* in proximity to the corner or the bus shelter, where the snow from the [earlier] storm had been cleared." *Id.* (emphasis added). Similarly, in *Schwartz v. Brooklyn & Queens Transit Corp.*, a trolley car stopped over a patch of ice.

264 A.D. 905, 36 N.Y.S.2d 70, 70–71 (N.Y.App.Div.1942). The court noted that there were other nearby places that were free of ice. *Id.* at 70–71. The court held that the defendant's negligence was a question of fact. *Id.* at 70–71. In *Hickey* and *Schwartz*, whether the common carrier breached its duty was a jury question in part because the place where it chose for the passengers to alight was not the most safe.

In contrast to *Hickey* and *Schwartz*, the record in this case indicates that the bus driver chose the most clear area—under the covered driveway—for the passengers to alight. Although some snow and ice existed under the covered driveway, the covered driveway was more clear than the area outside of the covered driveway. As Mrs. Blake stated in her deposition:

Q: Was there a clearer spot that you could see than underneath the canopy?

A: No, not that I know of.

(Mrs. Blake Dep. at 34.) The only evidence that plaintiffs offer that under the covered driveway was not the best place to alight was the testimony of their expert, Ned Einstein. Einstein concludes that a nearby walkway ramp, the other side of the covered driveway, or closer to the curb would have been safer areas to stop.

■ Under Fed.R.Evid. 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived or known to the expert at or before the hearing." As the Fourth Circuit has stated, "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."

---

**3.** The duty may extend for several steps if the plaintiff alights directly onto a hazardous condition or is forced to navigate a treacherous path. *See, e.g., id.* at 110–11, 511 N.Y.S.2d

612. The extent of the duty does not matter here as Mrs. Blake disembarked in the most safe available area.

*Tyger Constr. Co. v. Pensacola Constr. Co.,* 29 F.3d 137, 142 (4th Cir.1994). A district court has a responsibility to ensure that an expert's opinion has an adequate basis in fact. *Id.* at 143. In *Tyger*, an expert testified that the delay in a construction project was caused by a lack of stockpiled sand. *Id.* at 142–43. However, the record indicated that the sand stockpile was never depleted during the relevant time. *Id.* Therefore, the court held that the expert's conclusion as to the cause of the delay must be excluded because it was based on the unfounded speculation that the sand was depleted. *Id.*

■ Einstein concluded that at the time of Mrs. Blake's fall the walkway ramp was a better place to disembark. This conclusion is based on his inspection of the hotel three years after the accident and his review of photographs of the hotel taken by plaintiffs' counsel several days after the accident. (*See* Einstein Dep. at 69–75.) Einstein's conclusion is not based on any facts that describe the conditions at the hotel on date of the accident. (*See id.*) Einstein speculates that the walkway ramp was free of ice and that it was not blocked by snow. Nothing in the record supports that speculation.[4] The only available facts concerning whether the walkway ramp was accessible are from Rasnick. Rasnick testified that the walkway ramp was only used during the summer and only if the hotel had twenty or more buses to unload. (Rasnick Dep. at 29–30, 38, 44.) Rasnick further testified that the hotel did not unload passengers at the walkway ramp during the winter because the hotel often plowed snow up against the ramp.[5] (*Id.*)

Einstein also concludes that the other side of the covered driveway near the doors marked "Hotel Registration" would have been a better area to disembark. This conclusion is based on his speculation that this area was in better condition than the area where the bus did in fact stop. As with the condition of the walkway ramp, Einstein does not rely on any facts about the condition of the hotel registration entrance on the day that the accident occurred. (*See* Einstein Dep. at 69–75; Ex.# 7 at 12.)

As in *Tyger*, Einstein's conclusion that these other areas would have been a better area to disembark on the date of the accident is based on his speculation about the conditions of these areas on date of the accident. Therefore, under Fed.R.Evid. 703, Einstein's expert opinion must be excluded.

---

4. Einstein concludes that the walkway ramp and the sidewalk by the hotel registration entrance were ice free because they were slanted. According to Einstein, water would run off these surfaces. Of course, as Einstein realizes, ice can be formed by water and by snow, which does not run off of a slanted surface. (*See* Einstein Dep. at 73.)

The walkway ramp and the sidewalk by the hotel registration entrance are both within the covered driveway. Central to Einstein's conclusion that the walkway ramp or the sidewalk by the hotel registration entrance were better areas to alight is his speculation that water, and only water, formed the ice under the covered driveway. (*See id.*) Einstein speculates that the water was present because of either a rainstorm or water from a hose. (*See id.* at 73–74.) Einstein does not have any facts upon which to base this speculation. (*See id.*)

Ice could have been formed by snow under the covered driveway, on the walkway ramp, and on the sidewalk in front of the hotel registration entrance. As no facts exist which suggest the presence of water, but the record is clear that it was snowing, Einstein's conclusion that the ice under the covered driveway was formed by water and not snow is speculative.

5. To be clear, I am not crediting Rasnick's testimony over Einstein's. Rather, Einstein's expert opinion must be excluded because it is not based on fact as required by Fed.R.Evid. 703.

■ Einstein also suggests that the bus driver should have parked closer to the curb near the Fitness Center. (*See* Ex.# 7 at 13–14.) Einstein concedes that cars were stopped in between where the bus driver stopped and the curb in front of the Fitness Center. (*See id.*) Einstein concludes that the bus driver should have not let the passengers disembark until either he had the cars towed or found their drivers and forced the drivers to move their cars. Nothing in New York common law remotely requires a bus driver to take such extraordinary measures to create a more safe place to park.

Without Einstein's speculative testimony, the plaintiffs are unable to refute that the area the bus driver chose was the most safe place to disembark. Because the bus driver chose the most safe place to disembark, the defendants satisfied their duty under *Miller.*

### III.

■ Plaintiffs suggest that the bus driver could have taken additional precautions such as a loud warning, using rock salt, or providing more individual assistance to alighting passengers. These precautions may well have marginally decreased the risk of accident for the alighting passengers. However, New York case law does not require precautions beyond stopping at an area where the passenger can safely alight. *See, e.g., Miller*, 537 N.Y.S.2d 123, 534 N.E.2d at 41 ("A common carrier owes a duty to an alighting passenger to stop at a place where the passenger may safely disembark and leave the area."). Indeed, the case law is clear that a common carrier does not owe a duty to remove all risk. *See, e.g., Blye*, 124 A.D.2d at 114, 511 N.Y.S.2d 612. It is also worth noting that, according to Einstein, the use of rock salt by bus drivers is not industry

standard and is not required by any regulation. (Einstein Dep. at 110.) Although these extra precautions suggested by the plaintiffs may in some cases reduce the risk of injury, I am unwilling to extend New York common law to require that rock salt, verbal warnings, or individual assistance are necessary.